963 F.2d 368
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In Re: SEMINOLE OIL & GAS CORPORATION, Debtor,
Milton SHUCK, individually and as President, Stockholder and
Member of the Board of Directors of Seminole Oil
and Gas Corporation, Plaintiff-Appellant,
and
Anthony E. RODEN, Plaintiff,
v.
SEMINOLE OIL & GAS CORPORATION; Leonard Lane; Mildred
Lane; Eastridge Energy Company, Defendants-Appellees,
and
Marcia BARANY, Defendant.
 No. 91-1636.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 5, 1992
Decided: May 22, 1992
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Robert Earl Maxwell, Chief District Judge. (CA-86-87-W, BK-86-23-W)
 Argued: Allan R. Freedman, New York, New York, for Appellant.
 Robert Gerald Sable, Sable, Makoroff, Sherman & Gusky, P.C., Pittsburgh, Pennsylvania, for Appellees.
 On Brief: Robert W. Friend, Parkersburg, West Virginia, for Appellant.
 K. Bradley Mellor, Sable, Makoroff, Sherman & Gusky, P.C., Pittsburgh, Pennsylvania, for Appellee Seminole Oil & Gas; James Thomas McClure, Wheeling, West Virginia, for Appellees Lane and Eastridge Energy.
 N.D.W.Va.
 AFFIRMED.
 Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Plaintiff/appellant Milton Shuck appeals the decision of the District Court for the Northern District of West Virginia affirming the decisions of the Bankruptcy Court for the Northern District of West Virginia. Shuck lists 39 counts of error which are discussed in five parts to his brief. In general, Shuck contends that the bankruptcy court: (1) lacked subject matter jurisdiction because the petition was filed by an improperly constituted board of directors of the debtor; (2) should have appointed an examiner; (3) should have rejected the disclosure statement and liquidation plan; (4) should have found that the debtor's attorney was not disinterested; and (5) should have found that insiders were "looting" the debtor. For the reasons stated below, we affirm the decision of the district court.
 
 I.
 
 2
 The facts of this case are confused and muddled. The progression of events leads us through a maze involving two bankruptcy court proceedings, a West Virginia state court action, a Delaware state court action, and an appeal to the District Court for the Northern District of West Virginia. To compound matters, the courts below have not articulated a full statement of the facts nor have the parties done much more to shed light on the subject. As best as can be determined by those lacking Theseus' skills in navigating labyrinths, the facts are as follows.
 
 
 3
 Seminole Oil and Gas Corporation ("Seminole") was formed in the 1940's as an oil and gas concern operating primarily in southwestern United States. In 1973, Milton Shuck became the chief operating officer and principal shareholder of Seminole and led the company to acquire interests in various oil and gas ventures in West Virginia. Business soured and, in 1979, Seminole filed a petition for bankruptcy relief under Chapter 11 in the Southern District of New York. The bankruptcy case was subsequently transferred to the Northern District of West Virginia. Following the transfer, Robert Sable of the law firm of Lampl, Sable, Makoroff & Libenson[1] ("Lampl, Sable") was appointed as attorney for the debtor.
 
 
 4
 The present dispute finds its origins in 1982. Between December 1982 and June 1983, the debtor, through Shuck, entered into agreements with Andrew J. Arkin, Arthur J. Hohmann, and Piedmont Resources, Inc. ("Piedmont"), which according to Shuck is owned and controlled by Jack E. Shaw and A.L. Varah, in order to infuse capital into the debtor. With new capital available to the debtor, the bankruptcy judge confirmed a plan of reorganization. The plan of reorganization provided, inter alia, that the board of directors for the debtor would consist of Hohmann, Shaw, Varah, Arkin, and Shuck. The plan did not mention the circumstances warranting retention of jurisdiction by the bankruptcy court.
 
 
 5
 During the implementation of the plan, the parties, without seeking the court's involvement, reconstituted the board to comprise Arkin, Shaw, Shuck, and Gilbert Wallach. The new board, however, soon deadlocked. In response, Shuck called a meeting of the shareholders, which elected a new seven person board. The action by Shuck led, in turn, to Arkin and Shaw moving the bankruptcy court to issue a temporary restraining order against Shuck and the new directors. The bankruptcy court granted the motion, and, on May 7, 1984, the court entered an order further reconstituting the board to comprise Varah, Arkin, Shaw, Shuck, and a fifth member whom the court would later determine. About seven months later, on November 12, 1984, Shuck wrote to the bankruptcy court detailing various concerns and seeking further court intervention. However, the bankruptcy court agreed with Varah, Arkin, and Shaw, the majority of Seminole's board, that it no longer had jurisdiction over the matter because the reorganization plan had been substantially consummated. The constitution of the Seminole board, therefore, remained as reflected in the May 7, 1984, order.
 
 
 6
 Despite the order of the bankruptcy court, disputes between Shuck and the rest of the Seminole board continued. On May 20, 1985, Shuck petitioned the Delaware Chancery Court for a declaration that the board as reflected in the May 7, 1984, order was improperly constituted. After an initial hearing, the Delaware court requested additional evidence before entering an order. Shuck, however, provided no further evidence and, on March 3, 1988, the case was dismissed.
 
 
 7
 During the course of the Delaware action, Varah, Arkin, and Shaw began to sell Seminole's assets. One such transaction resulted in Piedmont commencing a foreclosure action on Seminole property through a deed of trust it held. Shuck, however, obtained an order from the Circuit Court of Roane County in September 1985 enjoining the transfer at the foreclosure action. Only a few months later, on January 14, 1986, Seminole, through its board as reflected in the May 7, 1984, order, filed another petition for bankruptcy relief under Chapter 11, which Shuck unsuccessfully contested. The debtor then sought to liquidate by transferring some of its assets to Montark, Inc., ("Montark"), which, according to Shuck, is owned and controlled by Varah, Arkin, and Shaw, at a price that Shuck claims is vastly undervalued. In addition, the liquidation plan listed Piedmont's claim as $600,000, which, according to Shuck, was much too high. Despite Shuck's arguments, the court issued orders permitting the sale of property to Montark and confirming the liquidation plan.
 
 
 8
 On appeal to the district court, Shuck, in his brief, listed thirtyeight grounds of error by the second bankruptcy court, but discussed only eight "points." On appeal to this court, Shuck's brief, in similar fashion, lists thirty-nine counts of error, but discusses only five points. For purposes of this appeal, we consider the issues on appeal to be those which are set out in the five points and which seem to encompass the thirty-nine grounds of error. The following issues appear raised: (1) whether the second bankruptcy court has subject matter jurisdiction; (2) whether the bankruptcy court improperly denied the motion for the appointment of an examiner; (3) whether the bankruptcy court improperly approved the disclosure statement and liquidation plan; (4) whether the bankruptcy court improperly found that the debtor's attorney was disinterested; and (5) whether the bankruptcy court should have found that insiders were "looting" the debtor.
 
 II.
 A. Subject Matter Jurisdiction
 
 9
 Shuck argues that the second bankruptcy court lacks subject matter jurisdiction because, in essence, no entity has filed for bankruptcy relief. The board which filed the petition traces its authority to the May 7, 1984, order of the first bankruptcy court reconstituting the board. Shuck contends that this order is a nullity. According to Shuck, the first bankruptcy court lacked jurisdiction to reconstitute the board because the plan of reorganization had been substantially consummated. Consequently, no valid order was issued, and the board as reflected in that order had no authority to file a petition for bankruptcy relief.
 
 
 10
 Generally, bankruptcy courts should be wary of retaining control over debtors as wayward children warranting constant parental guidance. The fundamental goal of bankruptcy is to provide the debtor a "fresh start" free from, not only the dismembering hands of creditors, but also the tinkering of courts in the details of business decisions of reorganized concerns. The Second Circuit has aptly stated:
 
 
 11
 We have had occasion before to deplore the tendency of District Courts to keep reorganized concerns in tutelage indefinitely by orders purporting to retain jurisdiction for a variety of purposes, extending from complete supervision of the new business to modifications of detail in the reorganization.... Since the purpose of reorganization is clearly to rehabilitate business and start it off on a new and to-behoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility. It is not consonant with the purposes of the Act, or feasible as a judicial function, for courts to assume to supervise a business somewhat indefinitely.
 
 
 12
 North American Car Corp. v. Peerless Weighing & Vending Machine Corp., 143 F.2d 938, 940 (2d Cir. 1944) (citations omitted); see Goodman v. Phillip R. Curtis Enters., Inc., 809 F.2d 228, 232 (4th Cir. 1987).
 
 
 13
 Despite this admonition, a bankruptcy court can retain jurisdiction for specific purposes. Post-confirmation jurisdiction exists over an issue for which the bankruptcy court has specifically reserved in the order confirming the plan or the plan itself. See, e.g., Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World Wide Moving, Inc.), 111 B.R. 457 (Bankr. S.D.N.Y. 1990); Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc., 25 B.R. 484, 499 (Bankr. S.D. Ohio 1982). In essence, the parties have agreed by accepting the plan to allow the court to address certain specified issues post-confirmation. In Neptune, the bankruptcy court had provided for the retention of limited jurisdiction in the plan of confirmation. The debtor, however, attempted to bring an adversary proceeding against a creditor for conversion, breach of a fiduciary duty, and recovery of preferential transfers. The bankruptcy court stated that there was "no provision in the plan or order confirming the plan which authorizes a retention of jurisdiction for the purpose of resolving post-confirmation adversary proceedings or, more significantly, permitting the debtor to commence any adversary proceedings after confirmation." Neptune, 111 B.R. at 462-63.
 
 
 14
 Shuck notes that no such "provision" is reflected here in the order confirming the plan or the plan itself. As such, Shuck turns to the Code and points out that section 1141(b) vests all property of the estate in the debtor upon the confirmation of the plan. See 11 U.S.C. § 1141(b) (1988). Hence, Shuck argues that the debtor is entitled to control its own property free of the control of the bankruptcy court because the bankruptcy court did not specifically retain jurisdiction in the order confirming the plan or the plan itself.
 
 
 15
 The plan, however, is only one source of post-confirmation jurisdiction for the court. Confirmation does not absolutely strip the bankruptcy court of jurisdiction where the court has not reserved jurisdiction. For example, the bankruptcy court need not provide in the order confirming the plan or the plan itself the circumstances warranting court intervention to modify or implement the plan. The Code specifically allows for both modification and implementation. Section 1127(b) provides in pertinent part:
 
 
 16
 The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan.... Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.
 
 
 17
 11 U.S.C. § 1127(b) (1988). In addition, Section 1142(b) provides in pertinent part:
 
 
 18
 The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.
 
 
 19
 11 U.S.C. § 1142(b) (1988).
 
 
 20
 While Shuck does recognize that the bankruptcy court has statutory authority to modify a plan, he maintains that the court's jurisdiction to modify ends upon "substantial consummation" of the plan. The Code defines "substantial consummation" as:
 
 
 21
 (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
 
 
 22
 (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
 
 
 23
 (C) commencement of distribution under the plan.
 
 
 24
 11 U.S.C. § 1101(2) (1988). In essence, Shuck argues that the plan of reorganization was substantially consummated by the end of 1983, well before the May 7, 1984, order. We disagree.
 
 
 25
 We note first that this case appears more closely to involve implementation of the plan rather than modification because the contested order restructured the board without altering or otherwise modifying the plan. Therefore, jurisdiction does not hinge on whether the plan has been substantially consummated. Rather, jurisdiction exists for acts "necessary for the consummation of the plan." See In re Terracor, 86 B.R. 671, 676 (D. Utah 1988) ("The clear intent of section 1142(b) is for the court to retain its jurisdiction to assure that the terms and provisions of the confirmed Chapter 11 plan are carried out until the plan is completed and a final decree is entered closing the case."); In re Coral Air, Inc. 40 B.R. 979, 982 (D.V.I. 1984); In re Johns-Manville Corp., 97 B.R. 174, 180 (Bankr. S.D.N.Y. 1989). Shuck, however, does not focus on the scope of post-confirmation jurisdiction to effect the implementation of the plan.
 
 
 26
 Second, we find that neither substantial consummation nor full consummation had occurred by May 7, 1984, the date of the order reconstituting the board. The bankruptcy court properly retained jurisdiction to oversee the infancy of a complicated reorganization. The bankruptcy court issued the order confirming the plan of reorganization on October 19, 1983. From that date until May 7, 1984, 107 docket entries were made. Most significantly, on January 27, 1984, Piedmont and others moved the court to revoke the confirmation. Furthermore, a hearing was not held on the motion until May 1, 1984, only six days before the order reconstituting the board. The bankruptcy court was still mired in a muddled case attempting simply to direct an orderly reorganization. As previously stated, a bankruptcy court should relinquish jurisdiction over a reorganized concern; however, if the court had relinquished jurisdiction in December 1983, as Shuck suggests, Seminole would have been abandoned in the infancy of its reorganization.[2]
 
 
 27
 In sum, because we find that the first bankruptcy court possessed jurisdiction to issue the May 7, 1984, order, the board, as reflected in that order, had authority to petition for bankruptcy relief.
 
 B. Appointment of an Examiner
 
 28
 Shuck asserts that the district court erred in finding that he had ample opportunity to examine documents in possession of Seminole. Shuck argues that the bankruptcy court conducted no formal hearing, would not "listen" until after confirming the liquidation plan, and would not give him the opportunity to cross-examine Varah and others.[3] Under Rule 2004(a), "the Court may order the examination of any entity." Fed. R. Bankr. P. 2004(a) (emphasis added). The decision whether to appoint an examiner is within the sound discretion of the bankruptcy court. We cannot find any abuse of discretion on the part of the bankruptcy court. Furthermore, Shuck has offered no evidence that would indicate that the bankruptcy court would not have been receptive to a motion to compel if Shuck's initial attempts at discovery proved fruitless. As the district court stated, Shuck offers only "unsupported urgings and conclusions" that the court failed to heed his requests for court intervention in the discovery process.
 
 
 29
 C. Approval of the Disclosure Statement and Liquidation Plan
 
 
 30
 Shuck argues that the disclosure statement contained numerous falsehoods and misstatements which led creditors to vote for the plan. Shuck mentions that he made numerous objections, but does not repeat them here.[4] Shuck does assert that the insiders of Seminole were trying to "loot" the debtor and that, coupled with the court's refusal to compel further disclosure of evidence, this court should reverse the approval of the disclosure statement and plan. Shuck's allegations, however, are unsupported. A finding that the bankruptcy court was clearly erroneous cannot be supported by mere allegations.
 
 
 31
 D. Disinterestedness of the Debtor's Attorney
 
 
 32
 Shuck claims that the court should not have approved the representation of the debtor by Lampl, Sable. Shuck asserts that Lampl, Sable is an "interested person" because it"had represented Varah and one or more of the other Varah conspirators ... and Piedmont."[5] "When a motion is made to disturb a client's choice of counsel, the court is required to carefully exercise its discretion and to weigh all of the competing factors involved." In re Iorizzo, 35 B.R. 465, 468 (Bankr. E.D.N.Y. 1983); see Law Office of J.E. Losavio v. Trustee and Creditors' Committee (In re Neidig Corp. ), 113 B.R. 696, 698 (D. Colo. 1990). Section 327(a), concerning employment of professional persons, provides in pertinent part:
 
 
 33
 [T]he [debtor-in-possession], with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor-inpossession] in carrying out the [debtor-in-possession's] duties under this title.
 
 11 U.S.C. § 327(a) (1988).[6]
 
 34
 An attorney, however, should not be disqualified"solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor, in which case the court shall disapprove such employment if there is an actual conflict of interest." 11 U.S.C. § 327(c) (1988); see In re Lee Way Holding Co., 102 B.R. 616 (S.D. Ohio 1988), modified on other grounds, No. C287-1283, 1989 U.S. Dist. LEXIS 13,779 (S.D. Ohio Jan. 11, 1989). Although Shuck did object to the representation, we cannot find that the bankruptcy court abused its discretion by approving the representation while reserving its final ruling if an issue of actual conflict arose. Shuck had not produced any evidence of an actual conflict of interest. Furthermore, Lampl, Sable was familiar with the "two file cabinets" of documents involving the Seminole cases. (J.A., 80a). A change in attorneys would necessarily have resulted in enormous costs adverse to the interests of the estate. Without an actual conflict of interest, such a draconian measure would have been unwarranted.
 
 E. Sale to Insiders
 
 35
 Shuck claims that the bankruptcy court erred by failing "to require the requisite showing of fairness to support the sale" of Seminole's assets to insiders such as Varah. Shuck, however, does not explain further what the "requisite showing of fairness" entails. As the district court states, "[t]hese general conclusions present no factual findings which are urged to be erroneous nor conclusions of law for review in this Court." The only genuine issue which Shuck may be raising when complaining of the bankruptcy court's failure "to require the requisite showing of fairness" is whether proper notice was given to all interested parties of the sale to insiders.
 
 
 36
 As we have previously stated, "transactions involving insiders should be closely scrutinized." Harman v. First American Bank (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 484 (4th Cir. 1992). Nevertheless, Shuck does not offer any evidence, beyond conclusory allegations, that the creditors were not fairly notified of the sale to insiders or that the creditors had no opportunity to make their own bids. If, as Shuck claims, assets worth as much as $25,000,000 were sold to insiders for only $70,000, the court finds it hard to believe that others would not have proposed higher bids for the "bargains." Without evidence of a failure to notify, a secret sale, or other fraudulent activity, the court is constrained to uphold the district court. Therefore the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 The firm has subsequently become known as Sable, Makoroff & Gusky
 
 
 [2]
 We do not suggest that in all cases a bankruptcy court does not lose jurisdiction until some point after seven months. The facts of each case must be closely scrutinized. The Seminole bankruptcy was rather unique. While it involved numerous parties, various courts, and interminable appeals, it also witnessed almost a revolving door of attorneys withdrawing from representation, seeking to withdraw from representation, or being prevented from representing various parties. The confusion necessitated closer oversight by the bankruptcy court. See Official Dalkon Shield Claimant's Committee v. Mabey (In re A.H. Robins Co.), 880 F.2d 769, 776 (4th Cir. 1989) (peculiar facts involved in the Dalkon Shield cases warranted continued jurisdiction)
 
 
 [3]
 Shuck seems to have strayed from the heading of his section which maintained that the refusal to appoint an examiner was error. In the section itself, Shuck argues haphazardly that both he was prevented from successfully examining the documents and an examiner should have been appointed. Regardless, both contentions are meritless
 
 
 [4]
 Shuck claims that the "severe" page limitation prevents him from examining his prior objections. However, Shuck used only about half of the page limit
 
 
 [5]
 We find critical the allegation by Shuck that Lampl, Sable had represented creditors in the bankruptcy case. Shuck offers no evidence that the representation continues. As such, we confine our discussion to the issue whether an attorney who has represented a creditor in the past may now represent the debtor. Furthermore, although Shuck claims that Lampl, Sable is a creditor and hence not disinterested, he offers as evidence only general allegations. For example, Shuck does not mention whether the amount owed is due from legal fees arising from the bankruptcy proceedings or unrelated matters. Such a distinction is relevant. Without more, we are powerless to find any abuse of discretion
 
 
 [6]
 Section 327 actually provides the trustee this power, but, according to § 1107, the debtor-in-possession has the same powers as the trustee unless otherwise ordered by the court. See 11 U.S.C. § 1107 (1988); see also 2 Collier on Bankruptcy p 327.01, at 327-2 (15th ed. 1991) ("In a reorganization case, section 1107(a) provides a debtor in possession with ... all of the rights and powers of a trustee serving in a case under chapter 11.")